**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

TIFFANY DREGNEY,

Plaintiff,

v. Case No.: 3:26-cv-1083

CARHARTT, INC;
DANIEL DEHLIN,

Defendants.

---

# COMPLAINT

---

Plaintiff Tiffany Dregney, by her undersigned counsel, alleges as follows against Defendants Carhartt, Inc. ("Carhartt" or the "Company") and Daniel Dehlin (together, "Defendants").

## NATURE OF THE ACTION

1. This is an action under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), to remedy Defendants' interference with, restraint of, and retaliation against Plaintiff's exercise of her FMLA rights.

2. Plaintiff, a Carhartt Sales Representative with a documented anxiety and panic disorder, used FMLA leave in 2024 and 2025 with Carhartt's approval. Her direct supervisor, Defendant Dehlin, openly resented her condition and her time away from work. In spring 2026 she reported Mr. Dehlin's mistreatment to Human Resources and then began FMLA leave for a serious exacerbation of her condition.

3. While she was on protected leave, Mr. Dehlin monitored her personal social media and scrutinized her Company expenses. Carhartt contacted her about work matters, declined to stop Mr. Dehlin's monitoring, told her she would return to his supervision, and pressed her for medical information beyond what the FMLA permits. When she asked Carhartt to identify the policy requiring that information, Carhartt announced within two days that it would fill her position.

4. Plaintiff seeks lost wages and benefits, liquidated damages, equitable relief, and attorneys' fees and costs.

## PARTIES

5. Plaintiff Tiffany Dregney ("Dregney") is an adult resident of Altoona, Eau Claire County, Wisconsin. At all relevant times she was employed by Carhartt and was an "eligible employee" under 29 U.S.C. § 2611(2): she had worked for Carhartt for at least 12 months and at least 1,250 hours in the 12 months before each leave at issue.

6. Defendant Carhartt, Inc. is a Michigan corporation headquartered at 5750 Mercury Drive, Dearborn, Michigan 48126. Carhartt is engaged in commerce and employs 50 or more employees within 75 miles of each worksite for each working day in 20 or more calendar workweeks per year. It is an "employer" under 29 U.S.C. § 2611(4)(A).

7. Defendant Daniel Dehlin ("Dehlin") is an adult individual who, on information and belief, resides in Marquette, Michigan.

8. At all relevant times he was employed by Carhartt as an Active Channel Manager and was Dregney's direct supervisor.

9. Dehlin acted directly and indirectly in the interest of Carhartt in relation to Dregney and is therefore an "employer". He controlled the terms and conditions of Plaintiff's employment, including her assignments, travel requirements, schedule, time-off requests, expense review, and performance expectations, and, on information and belief, provided input into decisions about her leave, her position, and her replacement.

10. Dehlin is sued in his individual capacity. Defendants are jointly and severally liable for the violations alleged.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2), because Dregney's claims arise under federal law.

12. This Court has personal jurisdiction over Defendants. Carhartt employed Dregney in Wisconsin and directed the conduct alleged to her here. Dehlin supervised Dregney's Wisconsin-based work, directed her travel and duties from and within Wisconsin, and purposefully directed the conduct alleged at Dregney in Wisconsin.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2). Dregney lived and worked from this District, managed her sales territory from here, took her FMLA leave here, and received the communications and suffered the injuries alleged here.

## JURY DEMAND

14. Dregney demands a trial by jury on all issues so triable.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Employment and Serious Health Condition

15. Carhartt hired Dregney on or about May 8, 2023.

16. In March of 2025 Carhartt promoted Dregney to Sales Representative, a role requiring extensive travel, independent territory management, and customer presentations.

17. As a Sales Representative, Dregney reported directly to Dehlin.

18. Before her promotion, Dregney was diagnosed with severe anxiety and panic disorder. She has been under the continuing care of a licensed therapist and psychiatrist, and takes prescribed medication, throughout her employment.

19. Dregney’s condition is a "serious health condition" under 29 U.S.C. § 2611(11) and 29 C.F.R. §§ 825.113 and 825.115, because it requires continuing treatment by a health care provider and causes episodic periods of incapacity.

**B. Plaintiff's Prior FMLA Leave and Mr. Dehlin's Hostility Toward It**

20. In 2024 Carhartt approved continuous FMLA leave for Dregney to receive outpatient treatment for her condition.

21. In 2025 Carhartt approved intermittent FMLA leave for Dregney for the same condition.

22. Carhartt administers FMLA leave, short-term disability, and company medical leave through its third-party administrator, The Lincoln National Life Insurance Company ("Lincoln Financial").

23. Dehlin received Company communications about Dregney’s FMLA leave and knew it had been approved. Dregney also discussed her diagnoses with him on multiple occasions.

24. After learning of Dregney’s condition, Dehlin told her he felt he had "hired the wrong person."

25. Dehlin told Dregney that if she "can't handle the job," he "would find someone else who could," and that her mental health was "not his problem."

26. When Dregney asked for time away from work to manage her condition before Sales Meetings and travel, Dehlin responded by questioning the exact number of days she had already taken.

27. On information and belief, Dehlin did not question a similarly situated colleague who used extensive time off.

28. Dehlin also showed Dregney private emails about a coworker's mental health and told her, "Now you can see someone who has them and still does the job."

**C. Dregney Complains to Human Resources, Then Begins FMLA Leave**

29. On or around April 2026, encouraged by another manager, Gloria Lee, Dregney reported Dehlin's treatment of her to Human Resources Business Partner Paige DeBono ("DeBono"), and participated in an interview with Human Resources ("HR").

30. HR told Dregney that Dehlin was under strict instruction that retaliation was not acceptable and that he would not contact her.

31. At Carhartt's April 2026 Sales Meetings, Dregney was visibly ill.

32. A telehealth physician had advised her not to attend.

33. When Dehlin's supervisor asked what was wrong with Dregney, Dehlin replied, "I guess she doesn't feel good."

34. Dregney was locked in the back of a Company vehicle by its child-safety lock, Mr. Dehlin told her, "You are in quarantine," and walked away.

35. Dregney was not able to leave the vehicle as Dehlin had engaged the child safety locks.

36. Another coworker had to let Dregney out of the vehicle.

37. After the Sales Meetings, Dregney suffered a severe panic attack at Detroit Metropolitan Airport. She could not board her flight without help and required emergency mental-health care.

38. The following week, Dehlin told Dregney she was "cooked" at the Sales Meetings.

39. On or about April 27, 2026, Dregney requested and began continuous FMLA leave for her serious health condition. Her leave was supported by certification from her health care providers and approved by Lincoln Financial on Carhartt's behalf.

**D. Defendants Interfere with Plaintiff's Leave**

40. On May 8, 2026, while Dregney was on FMLA leave, Senior HR Business Partner Kate Mosher “Mosher” emailed her that Carhartt had completed its review of her complaint about Dehlin. On a call that day, Mosher told Dregney her complaints had "no merit."

41. Dregney suffered an acute panic attack during the call and handed the phone to her partner. Mosher ended the call and did not follow up.

42. During Dregney’s FMLA leave, Dehlin viewed Dregney’s personal TikTok profile, a platform on which they had no mutual connections, after Dregney had blocked him on text messaging and social media. Before her leave, he had never done so.

43. On or about May 18, 2026, Dregney emailed Mosher and DeBono under the subject "Concerns Regarding my FMLA leave." She reported Dehlin's monitoring, stated that it felt intimidating, "raises concern about retaliation," and was worsening her anxiety and sleep, and asked that the no-contact instruction be enforced.

44. Mosher replied the same day that viewing her profile was "unlikely to violate any rules related to contacting an employee who is on FMLA or amount to retaliation."

45. Mosher informed Dregney's that when her leave ended, Carhartt expected Dregney and Dehlin to "resume normal business communication through all of our typical modes (including phone calls, texts, emails, face-to-face, etc)."

46. Dregney told HR she wanted to remain at Carhartt and could continue in her role, but not under Dehlin. HR told her that if she returned, she would continue reporting to him.

47. During Dregney's leave, Dehlin reviewed or was consulted on charges to Dregney's Company card.

48. On July 2, 2026, Mosher emailed Dregney to account for a $150.00 charge, stating that "[Dehlin] does not know what this expense is" and raising the possibility of fraud. Dregney had documented the charge weeks earlier. She responded that she was attending a family funeral that day and a burial the next.

49. Mosher's July 2 email also asked to schedule a call about Dregney's return "around July 13, 14 or 15."

**E. Defendants Demand Medical Information and Give Away Dregney's Position**

50. Dregney's health care providers certified her continued need for leave. Lincoln Financial approved the leave and confirmed to Dregney that she had "satisfied all of their requirements" and that all requested documentation had been received.

51. Dregney exhausted her 12-week FMLA entitlement on or about July 20, 2026.

52. Lincoln Financial then approved continued medical leave under Carhartt's company medical-leave policy, extended to at least September 13, 2026.

53. Dregney remains on short-term disability claim through October 26, 2026.

54. On information and belief, other Sales Representatives who needed medical leave beyond FMLA received extensions under Carhartt's medical-leave policy while Carhartt held their positions.

55. On July 24, 2026, immediately after learning of the extension, Mosher demanded that Dregney obtain from her doctor, within one week, "a written communication … indicating when you're expected to be able to return to work with or without restrictions" and what those restrictions would be.

56. Mosher acknowledged Dregney had a medical appointment on August 18 but said Carhartt needed the information "sooner."

57. Carhartt sought this information directly from Dregney, outside Lincoln Financial's certification process and beyond what Dregney's providers had already certified.

58. On July 28, 2026, Dregney explained in writing that her treating provider had left her clinic after completing all documentation Lincoln Financial requested, that her new provider could not yet assess her return date or restrictions, and that she remained in active treatment.

59. Dregney asked that medical information be handled through Lincoln Financial, and asked Carhartt to identify any written policy requiring otherwise.

60. Two days later, on July 30, 2026, Mosher responded that Carhartt would "start the process of finding a person who can perform those duties for the customers you support." She stated that once Dregney could return, Carhartt would "address the appropriate assignment for you."

61. Within days, Carhartt posted Dregney's Sales Representative position.

62. Carhartt has not told Dregney that any position will be available to her when she returns.

63. On September 6, 2026, Carhartt hired Ryan Peterson to fill Dregney's Sales Representative position.

64. On information and belief, Dehlin, as the manager responsible for Dregney's territory, participated in, recommended, or provided input into the decision to fill Dregney's position, and Carhartt relied on his input in making that decision.

65. Defendants' actions followed closely Dregney's FMLA leave, her May 18 complaint that she was being monitored and retaliated against during that leave, and her July 28 request that Carhartt follow proper channels for medical information.

66. Defendants knew of Dregney's FMLA rights and acted with reckless disregard for them. Their violations were willful.

67. As a result, Dregney has lost or faces loss of wages, benefits, and her position, and has incurred medical and other expenses.

## COUNT I — FMLA INTERFERENCE (29 U.S.C. § 2615(a)(1))

## (Against All Defendants)

68. Dregney incorporates the preceding paragraphs as if fully set forth herein.

69. Dregney was an eligible employee, Defendants were her employers under the FMLA, Dregney was entitled to FMLA leave for her serious health condition, and Dregney gave Defendants sufficient notice of her need for leave.

70. Defendants interfered with, restrained, and denied Dregney's FMLA rights by, among other things:

(a) in Dehlin's case, discouraging Dregney's use of leave by disparaging her condition, questioning her time away from work, and threatening to "find someone else";

(b) in Dehlin's case, monitoring Dregney's personal social media during her protected leave after she had blocked him and reported him to HR;

(c) requiring Dregney, during protected leave, to engage on work matters, including the outcome of Carhartt's investigation and an unfounded inquiry into a Company card charge that Dehlin had questioned;

(d) refusing to stop Dehlin's monitoring and telling Dregney she must resume full contact with him on her return, thereby discouraging her use of leave;

(e) seeking medical information directly from Dregney, outside Carhartt's designated administrator's certification process and beyond the information the FMLA permits an employer to require;

(f) using Dregney's FMLA leave as a negative factor in deciding to replace her; and

(g) on information and belief, failing to restore Dregney to her position or an equivalent position upon the expiration of her FMLA entitlement.

71. Defendants' interference prejudiced Dregney. It worsened her condition and prolonged her need for leave, deprived her of the full benefit of protected leave, and resulted in the loss of her position.

72. Defendants' violations were willful.

73. Dregney is entitled to relief against Defendants, jointly and severally.

**COUNT II — FMLA RETALIATION (29 U.S.C. §§ 2615(a)(1)–(2))**

**(Against All Defendants)**

74. Dregney incorporates the preceding paragraphs as if fully set forth herein.

75. Dregney engaged in protected activity by requesting and taking FMLA leave in 2024, 2025, and 2026; by complaining on May 18, 2026 that she was being monitored and retaliated against during her FMLA leave; and by asking on July 28, 2026 that Carhartt handle her medical information through its leave administrator and identify any policy requiring otherwise.

76. Defendants took materially adverse actions against Dregney, including removing her from and posting her Sales Representative position, refusing to hold her position during approved medical leave as Carhartt had for similarly situated employees, and leaving her with no assured assignment on return.

77. Defendants took these actions because of Dregney's protected activity. Causation is shown by, among other things:

(a) the two-day interval between Dregney's July 28 email and Carhartt's July 30 decision to replace her;

(b) Dehlin's documented hostility to Dregney's condition and leave, including his statements that he "hired the wrong person," would "find someone else," and that she was "cooked";

(c) Dehlin's monitoring of Dregney and his involvement in matters concerning her during her leave;

(d) on information and belief, Dehlin's participation in the decision to fill her position, through which his retaliatory animus influenced Carhartt's decision;

(e) Carhartt's more favorable treatment of similarly situated Sales Representatives who received extended medical leave with their positions held; and

(f) the pretextual nature of Carhartt's stated reason, "coverage … for the fall selling season," given that Carhartt knew of Dregney's leave and extension and, on information and belief, had covered her territory throughout her leave.

78. Defendants' violations were willful.

79. Dregney is entitled to relief against Defendants, jointly and severally, under 29 U.S.C. § 2617(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, jointly and severally, and award:

(a) a declaration that Defendants violated 29 U.S.C. § 2615(a)(1) and (a)(2);

(b) lost wages, salary, employment benefits, and other compensation, and any actual monetary losses, under 29 U.S.C. § 2617(a)(1)(A)(i);

(c) prejudgment interest under 29 U.S.C. § 2617(a)(1)(A)(ii);

(d) liquidated damages equal to the sum of the amounts awarded under subparagraphs (b) and (c), under 29 U.S.C. § 2617(a)(1)(A)(iii);

(e) equitable relief under 29 U.S.C. § 2617(a)(1)(B), including an order that Carhartt reinstate Plaintiff to her position or an equivalent one not supervised by Mr. Dehlin, or award front pay in lieu of reinstatement, and an injunction against further FMLA violations;

(f) reasonable attorneys' fees, expert witness fees, and costs under 29 U.S.C. § 2617(a)(3); and

(g) such other relief as the Court deems just and proper.

Dated: November 2, 2026

Respectfully submitted,

*Electronically signed by Tristan N. Bullington*
Tristan N. Bullington, SBN: 1138110
Alan C. Olson, SBN: 1008953
Attorneys for Plaintiff
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
Email: TBullington@Employee-Advocates.com
Email: AOlson@Employee-Advocates.com